# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

KEITH JACKSON,          )
                                )

     Petitioner,         )
                                )

v.                       )         No. 3:09-cv-00962
                                )         Chief Judge Haynes
                                )

JAMES FORTNER, Warden,   )
                                )

     Respondent.      )

## MEMORANDUM

Petitioner, Keith Jackson, a state inmate, filed this pro se action under 28 U.S.C. § 2254, seeking the writ of habeas corpus to set aside his state convictions for possession with intent to sell twenty-six grams or more of cocaine within 1,000 feet of a school, and possession of a firearm with intent to use it in an offense, for which Petitioner received an effective sentence of 36 years at one hundred percent (100%). After a review of the pro se petition, the Court granted Petitioner's motion to appoint counsel and appointed the Federal Public Defender to represent Petitioner. (Docket Entry No. 6). In his amended petition[1] prepared by his counsel, (Docket Entry No. 16), Petitioner asserts the following claims: (1) a sentencing in violation of Blakely v. Washington, 542 U.S. 296 (2004); (2) denial of effective assistance of trial counsel on multiple grounds; (3) improper jury instructions; (4) insufficient evidence at trial to support his conviction; and (5) his actual innocence. (Docket

---

[1] As in prior decisions, this Court deems the amended petition to supercede "completely" the pro se petition. Drake v. City of Detroit, Michigan, 266 Fed. Appx. 444, 448 (6th Cir. 2008). The Federal Rules of Civil Procedure can apply in a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005). Under Fed. R. Civ. P. 15(a), the filing of an amended complaint supercedes the prior complaint. Drake, 266 Fed. Appx. at 448; Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986).

Entry No. 16).

Respondent filed an answer containing portions of the state record. (Docket Entry No. 27). In his answer, Respondent contends, in sum: (1) that the state courts' denial of Petitioner's <u>Blakely</u> sentencing violation claim is neither contrary to nor an unreasonable application of clearly established federal law; (2) that some of Petitioner's ineffective assistance of counsel claims are procedurally defaulted; (3) that Petitioner's improper jury instructions claim is procedurally defaulted; (4) that the state courts' denial of Petitioner's insufficient evidence claim is neither contrary to nor an unreasonable application of clearly established federal law; and (5) that Petitioner's actual innocence claim is not a ground for relief under the facts in this action. <u>Id.</u>

After a review of the record, the Court determined that the record was ripe for disposition. Based upon a review of the state record, the Court concluded that Petitioner is not entitled to habeas relief as the state courts made reasonable determinations under federal law of his exhausted claims and that Petitioner's unexhausted claims were procedurally defaulted without a showing of cause or prejudice.(Docket Entry Nos. 30 and 31 Memorandum and Order).

### A. Petitioner's Motion to Alter or Amend

Before the Court is Petitioner's motion to alter or amend (Docket Entry No. 33) the Order denying Petitioner's petition for the writ of habeas corpus. (Docket Entry No. 31). In his motion, Petitioner contends, in sum, that the Court treated the Respondent's answer as a motion; that the Court did not fix a date for a reply; and that Petitioner is entitled to an evidentiary hearing. In his motion, Petitioner seeks relief on his claims that "(1) he is entitled to habeas relief on the merits of his <u>Blakely</u> claim; (2) his procedural defaults of two ineffective-assistance-of-trial-counsel claims – one alleging ineffectiveness in litigating the motion to suppress and the other alleging

ineffectiveness in advising him about the state's plea offer –should be excused under <u>Martinez v. Ryan;</u> (3) he is entitled to relief on the merits of his claim that trial counsel was ineffective for failing to adequately litigate the motion to suppress; and (4) he is entitled to an evidentiary hearing to develop a record to support his claim of ineffective assistance of counsel at the plea bargaining stage" (Docket Entry No. 34, Petitioner's Memorandum at 1)

A review of the record reflects that the Court appointed counsel for Petitioner and his counsel filed an amended petition on April 16, 2010. (Docket Entry No. 16). Thereafter Petitioner's counsel did not pursue any matters on Petitioner's behalf. Upon review of the record, the Court ordered Respondent to file a response to the petition. (Docket Entry No. 21). Respondent filed an answer. (Docket Entry No. 27). Petitioner's amended petition and Respondent's answer both contained legal analyses and supporting precedents on their respective claims and defenses. Since the filing of the Respondent's answer, Petitioner did not move for leave to file a reply or for discovery or for an evidentiary hearing. Given the passage of more than a reasonable amount of time for such motions, the Court treated the record as sufficient for a decision on Petitioner's claims.

A motion to alter or amend a judgment under Rule 59(e)[2] "is extraordinary and is seldom granted because it contradicts notions of finality and repose." <u>Waiters v. City of Cleveland</u>, No. 1:08–CV–2006, 2009 WL 3063384, at *1 (N. D. Ohio Sept. 24, 2009). For relief, there must be "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." <u>Intera Corp. v. Henderson</u>, 428 F.3d 605, 620 (6th Cir.

---

[2] The Federal Rules of Civil Procedure are applicable to habeas actions so long as such application is consistent with the habeas statutes. Rule 12, Rules Governing Section 2254 Cases. See <u>Mayle v. Felix</u>, 545 U.S. 644, 664 (2005) (applying Fed. R. Civ. P. 15 to habeas action)

2005) (citing <u>GenCorp, Inc. v. Am. Int'l Underwriters</u>, 178 F.3d 804, 834 (6th Cir.1999)). "Rule 59(e) motions are aimed at *re*consideration, not initial consideration. Thus, parties should not use them to raise arguments which could, and should, have been made before judgment issued. Motions under Rule 59(e) must either clearly establish a manifest error of law or must present newly discovered evidence." <u>Sault Ste. Marie Tribe of Chippewa Indians v. Engler</u>, 146 F.3d 367, 374 (6th Cir. 1998) (emphasis in original) (quoting <u>FDIC v. World Univ. Inc.</u>, 978 F.2d 10, 16 (1st Cir. 1992)).

As to Petitioner's contention that the Court improperly construed Respondent's answer (Docket Entry No. 27) as a motion to dismiss, the word "motion" is not in the Court's Memorandum. Longstanding precedent reflects that the Court properly ruled on the the petition under the "normal" procedure in a habeas action:

> While these procedures may always be tailored to fit the needs of individual cases, I believe that Judge Grady of the Northern District of Illinois has **aptly described the normal initial steps in a habeas case:**
>
>> First, the petition is filed. Next, pursuant to Habeas Corpus Rule 4, the federal court reviews the petition to determine whether, on its face, the petition indicates that the petitioner is not entitled to relief in federal court. If the court determines that the petition passes this minimal test, the respondent is directed to answer the petition.... After a respondent answers and files the state record pursuant to Habeas Corpus Rule 5, it need not file any motion. [The court] simply proceed[s] to rule on the petition.

<u>Ukawabutu v. Morton</u>, 997 F. Supp. 605, 608 (D. N. J. 1998) (quoting <u>United States ex rel. Martin v. Chrans</u>, 1986 WL 7076 (N. D. Ill. June 11, 1986) (emphasis added and citations omitted).

In his motion, Petitioner notes that the Court did not set a time for a reply. To be sure, Rule 5(e) of the Rules Governing Section 2254 Cases provides that "[t]he Petitioner may submit a reply to the Respondent's answer or other pleading within a time fixed by the judge." The Advisory

4

Committee Notes reflect that the word "reply" was substituted for the earlier word "traverse". As the committee notes to Rule 5 further explain that: "Rule 5 (and the general procedure set up by the entire set of rules) does not contemplate a traverse" and that "[i]n actual practice, the traverse tends to be a mere pro forma refutation of the return (answer)" and "it is not required except in those instances it will serve a truly useful purpose." Petitioner's counsel has not made any showing under Rule 5(e) that the reply would have served a "truly useful purpose".

As to whether a reply would serve a useful purpose, the habeas statutes create a statutory presumption of the correctness of the state courts' findings, 28 U.S.C.§ 2254(e)(1). Petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence". Id. For this burden, if the State answer or record is incomplete, Petitioner can move for discovery under Rule 6 of the Rules Governing Section 2254 Cases. Chrans,1986 WL 7076 at *2. Petitioner's counsel can also file a motion to expand the record under Rule 7 of the Rules Governing Section 2254 Cases for an assessment of whether an evidentiary hearing under Rule 8 of the Rules Governing Section 2254 Cases. Here, despite the pendency of this action for more than two years after Petitioner's counsel's entry of appearance and the filing of the state record, Petitioner's counsel did not request discovery nor move to expand the record filed by the Respondent. Absent such actions by Petitioner's counsel, the Court is unaware if there is any challenge to the state court record filed by the Respondent.

In his motion, Petitioner cites Martinez v Ryan, 132 S. Ct. 1309 (2012) that was decided on March 20, 2012, but Petitioner's counsel never presented this authority for almost a year prior to the Court's earlier ruling. In any event, in the interests of justice, the Court granted Petitioner an evidentiary hearing on his claims and contentions in his motion to alter or amend. This Memorandum includes the Court's prior analyses of Petitioner's claims and Respondent's

contentions.

## B. Procedural History

On August 19, 2003, a Davidson County jury found Petitioner guilty of possession with intent to sell twenty-six grams or more of cocaine within 1,000 feet of a school, and possession of a firearm with intent to use it in an offense. State v. Jackson, No. M2004-00562-CCA-R3-CD, 2005 WL 839299 at *1 (Tenn. Ct. Crim. App. Apr. 12, 2005). The state trial court imposed a 36 year sentence for the drug offense at one hundred percent (100%) and a three year sentence for the firearm offense, to run concurrently. Id. On direct appeal, the Tennessee Court of Criminal Appeals vacated the firearm conviction for insufficient evidence, but affirmed the other conviction. Id. at *15. On October 17, 2005, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id. at 1.

On October 26, 2005, Petitioner filed his state post-conviction petition with several claims for which the state trial court appointed counsel. Jackson v. State, No. M2008-145-CCA-R3-PC, 2009 WL 276781 (Tenn. Ct. Crim. App. Feb 4, 2009). On July 2, 2007, Petitioner had an evidentiary hearing after which the trial court denied relief. Id. On post-conviction appeal, the Tennessee Court of Criminal Appeals affirmed the trial Court's order. Id. On June 29, 2009, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id.

Petitioner later filed two state petitions for the writ of habeas corpus challenging the legality of his sentence under Tennessee Sentencing Reform Act . In those actions, Petitioner contended that Tennessee law did not require him to serve 100% of his sentence. The first petition was denied as meritless under state law. Jackson v. State, No. M2008-09156-CCA-R3_HC, 2009 WL 1026058 81 (Tenn. Ct. Crim. App. April 15, 2009). The second state habeas action made a similar

challenge relating to Petitioner's eligibility for early release. That claim was deemed to be waived.

Jackson v. State, No. M2010-00446-CCA-R3-HC, 2011WL 345908 at * 2 (Tenn. Ct. Crim. App. Feb. 1, 2011)

## B. Exhausted State Claims

## 1. Review of the State Court

As to the facts underlying Petitioner's conviction, on direct appeal the Tennessee Court of Criminal Appeals found[3] as follows:

I. Facts

In October of 2001, a Davidson County Grand Jury indicted the Defendant for possession with the intent to sell twenty-six (26) grams or more of a substance containing cocaine in a Drug-Free School Zone and possession of a firearm with the intent to employ it in the commission of or escape from an offense. A Davidson County Jury convicted the Defendant of both of these charges. The trial court sentenced the Defendant to thirty-six years, at 100%, for the possession with the intent to sell twenty-six (26) grams or more of a substance containing cocaine in a Drug-Free School Zone and to three years, at 35%, for the possession of a firearm with the intent to employ it in the commission of or escape from an offense. The trial court ordered that the sentences be served concurrently.

The following evidence was presented at the Defendant's trial: J.D. Jones, a lieutenant with the Metropolitan Police Department, testified that, **on September 28, 2001, he and other officers executed a search warrant for an apartment, located in an apartment complex, at 1612 16th Avenue, Nashville. The officer said that he was wearing a vest and a raid jacket that identified him as a police officer, and he and the other officers announced their presence by yelling that they were executing a search warrant. Lieutenant Jones testified that, as he was approaching the apartment, he noticed four men, who appeared to be gambling, on the stoop of an apartment located in front of the apartment that the officers were searching. As the other officers went to search the back apartment, he attempted to control the four men who were on the stoop. As he did so, the men walked away, while placing objects in their pockets. The lieutenant requested that another officer assist him control these men, and, at that time, the Defendant ran away from the officer. Lieutenant Jones drew his gun and told the Defendant to get on the ground,**

---

[3] State appellate court opinion findings can constitute factual findings in a habeas action, Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness. 28 U.S.C. § 2254(e).

**and, after the Defendant ran approximately fifty yards, the Defendant returned to the apartment.**

Lieutenant Jones testified that Officer Johnson came outside to assist him and Officer Johnson searched the Defendant. **The lieutenant noticed a Monte Carlo, that had a temporary tag, parked near his police car, and he asked if anyone had the keys to that car. He testified that none of the men said that they knew anything about the vehicle. Lieutenant Jones later discovered that the temporary tag was issued to the Defendant's mother. The lieutenant attempted to unlock the Monte Carlo using keys found on the Defendant, and, after he determined that the keys successfully unlocked the car, he re-locked the car and called for a K-9 unit to search the car for the presence of narcotics.**

Lieutenant Jones testified that he was present for the K-9 search of the Monte Carlo. He said that the police dog alerted for the presence of narcotics by scratching on the passenger side door. Lieutenant Jones testified that he and the other officers opened the vehicle and found approximately $38,000 in the right passenger seat. He said that the dog also alerted the officers to the console inside the vehicle, and the officers found a bag that contained between fifty and sixty grams of cocaine. Lieutenant Jones testified that he also discovered a gun between the console and the driver's seat, and electronic scales that had cocaine residue were recovered from the console. He testified that, under the seats of the vehicle, he found dryer sheets, which are typically used to mask the scent of drugs. The lieutenant said that the Defendant did not tell him where the Defendant had acquired $38,000, and the Defendant said that he was unemployed.

Lieutenant Jones testified that he also recovered several papers and a Sprint cell phone box with a bill from the car. He said that the Sprint cell phone bill was for an account held in the Defendant's name. The lieutenant found three cell phones either on the Defendant's person or in the car. Lieutenant Jones stated that, based on his experience, people involved in drug trafficking use multiple cell phones to avoid detection. **Lieutenant Jones testified that there was a receipt in the car for its purchase. He said that the receipt was from an auto sales store, and it described the vehicle as a black Chevrolet Monte Carlo that was purchased for $5900 in cash and paid for by the Defendant. The receipt was signed by Donna Jackson, the Defendant's mother.**

On cross-examination, Lieutenant Jones testified that the search warrant was for apartment C, the unit that was the farthest away from the street. He said that he believed the Defendant had two cell phones on his person and one in the vehicle, but he admitted that there may have been only one on the Defendant. He testified that there were several keys on the key chain he obtained from the Defendant, and there could have been keys to three different cars.

Samuel Johnson, an officer with the Metro Police Drug Task Force, testified that he was one of the officers that executed a search warrant at 1612 16th Avenue North, apartment C, on

September 28, 2001. He said that apartment C was located in a building that contained several apartments. The officer said that, when he arrived at the apartment building, he saw four men on the front porch of another, nearby apartment. He testified that he wore a police uniform, and it was his responsibility to enter and secure apartment C for the other officers. Officer Johnson testified that, while he went to apartment C, Lieutenant Jones approached the four men on the nearby porch. Later, he assisted Lieutenant Jones by searching the Defendant, to ensure officer safety, and he noticed a bulge in the Defendant's pocket of his pants. Officer Johnson testified that the Defendant told him that the bulge was money, and the Defendant gave the officer permission to remove the money. The officer explained that he removed two bunches of money totaling $5921, $2000 of which was wrapped in a white grocery bag secured by rubber bands. He testified that the Defendant also had keys and a driver's license in his pocket, and he removed all of these items and placed them on the sidewalk. Officer Johnson testified that he was present when Lieutenant Jones inquired about the Monte Carlo, and no one responded.

Officer Johnson testified that the K-9 officer and dog arrived to examine two vehicles, one in front of the apartment and the black Monte Carlo located on the street. He said that the dog gave a positive alert to the presence of the odor of narcotics. He said that the dog scratched the door of the Monte Carlo, and Lieutenant Jones opened the door with the Defendant's keys. The dog again alerted positively to the presence of narcotics in the console area, where they found a bag containing approximately 59 grams of cocaine. The officer also found in the car drug scales, a .9 millimeter handgun, a bag containing about $36,000, dryer sheets, some baggies, and paperwork on the vehicle. He testified that the money seized totaled $43,886. Officer Johnson testified that the Defendant did not live at the address where he executed the search warrant.

On cross-examination, Officer Johnson testified that his notes indicated that only one cell phone was taken from the Defendant. He agreed that, when he arrived at the location, the Defendant was two doors down from apartment C, on the corner stoop. He said that he did not find any drugs on the Defendant's person.

Ken Spencer, a sergeant with the Metro Police Department, testified that he was the K-9 handler in this case, and he assisted in the execution of the search warrant at 1612 16th Avenue. He said that he and his drug K-9, named Rocky, were trained through the United States Police K-9 Association. He explained that he and Rocky had to be re-certified every year as a K-9 handler team, and he said that they were certified on September 28, 2001. He said that he was called to the 16th Avenue location to perform a vehicle search on a black Monte Carlo. He testified that the dog alerted him to the passenger's side door, by scratching, which informed him that the dog detected an odor of narcotics coming from the vehicle. Sergeant Spencer testified that he opened the passenger side door of the Monte Carlo, and the dog immediately went to the rear passenger side floorboard and indicated again on a sack, which contained a large amount of money. He said the dog also alerted him to the center console of the vehicle, where he found a bag of white powder that later tested positive for

cocaine. Sergeant Spencer said that it is common for money to get contaminated with the scent of narcotics, which was why the dog alerted him to the money. He testified that he also found dryer sheets in the car, which drug dealers believe mask the scent of the narcotics.

Donna Flowers testified, as an expert in forensic chemistry, that she works at the Tennessee Bureau of Investigations ("TBI") Crime Laboratory and she analyzes substances that various law enforcement agencies submit for the presence of controlled substances or drugs. Flowers said that she analyzed the white powder in this case, and she concluded that the powder was cocaine, a schedule two controlled substance, and it weighed 59.2 grams.

Scott Cherry, a land surveyor, testified that he owns his own business and one of the primary functions of that business is to conduct engineering surveys. He identified a map from the Metro Planning Commissioner and said that it is normal procedure to rely on such a map. He testified that a police officer took him to the location of the search warrant, 1612 16th Avenue, and he measured the distance from the Wharton School to that location. Cherry testified that he determined the property lines of the school, and he used a Global Positioning System ("GPS") to measure from two corners of the school property line to the location at 1612 16th Avenue. He admitted that he does not have specialized training in the use of GPS but an employee at his business received such training and that employee taught him how to use the GPS system. He said that he uses this equipment about three or four times per week. Cherry testified that, based on his two measurements of the shortest distance and the distance from the corner of the school property, the distances were 939 feet and 947 feet from the location at 1612 16th Avenue FN1. He said that the measurements were accurate to within about one inch. On cross-examination, Cherry testified that the Wharton School is not visible from the location on 16th Avenue. He agreed that between the 16th Avenue location and the school property there is 17th Avenue, 18th Avenue, two alleys, and four rows of houses.

Jackson, 2005 WL 839299 at ** 1-4 (emphasis added).

In the post-conviction appeal, the Tennessee appellate court made additional factual findings

relating to the search of Petitioner and the vehicle in the area where Petitioner was arrested

> **On September 28, 2001, officers executed a search warrant for an apartment in a Nashville apartment complex.** See State v. Keith Latrell Jackson, No. M2004-00562-CCA-R3-CD, 2005 WL 839299, at * 1 (Tenn.Crim.App., Nashville, Apr. 12, 2005), perm. to appeal denied, (Tenn. Oct. 17, 2005). **Four men, including the Petitioner, appeared to be gambling on the stoop of an apartment located in front of the apartment that the officers were searching. See id. The Petitioner fled but, after running approximately fifty yards, returned to the apartment. <u>See id.</u>**

**[J.D. Jones, a lieutenant with the Metropolitan Police Department] noticed a Monte Carlo, that had a temporary tag, parked near his police car, and he asked if anyone had the keys to that car. He testified that none of the men said that they knew anything about the vehicle. Lieutenant Jones later discovered that the temporary tag was issued to the [Petitioner's] mother. The lieutenant attempted to unlock the Monte Carlo using keys found on the [Petitioner], and, after he determined that the keys successfully unlocked the car, he re-locked the car and called for a K-9 unit to search the car for the presence of narcotics.**

Lieutenant Jones testified that he was present for the K-9 search of the Monte Carlo. He said that the police dog alerted for the presence of narcotics by scratching on the passenger side door. Lieutenant Jones testified that he and the other officers opened the vehicle and found approximately $38,000 in the right passenger seat. He said that the dog also alerted the officers to the console inside the vehicle, and the officers found a bag that contained between fifty and sixty grams of cocaine. Lieutenant Jones testified that he also discovered a gun between the console and the driver's seat, and electronic scales that had cocaine residue were recovered from the console. He testified that, under the seats of the vehicle, he found dryer sheets, which are typically used to mask the scent of drugs. The lieutenant said that the [Petitioner] did not tell him where the [Petitioner] had acquired $38,000, and the [Petitioner] said that he was unemployed.

Lieutenant Jones testified that he also recovered several papers and a Sprint cell phone box with a bill from the car. He said that the Sprint cell phone bill was for an account held in the [Petitioner's] name. The lieutenant found three cell phones either on the [Petitioner's] person or in the car. Lieutenant Jones stated that, based on his experience, people involved in drug trafficking use multiple cell phones to avoid detection. Lieutenant Jones testified that there was a receipt in the car for its purchase. He said that the receipt was from an auto sales store, and it described the vehicle as a black Chevrolet Monte Carlo that was purchased for $5900 in cash and paid for by the [Petitioner]. The receipt was signed by Donna Jackson, the [Petitioner's] mother.

....

Samuel Johnson, an officer with the Metro Police Drug Task Force, testified that ..., when he arrived at the apartment building, he saw four men on the front porch of another, nearby apartment. He testified that he wore a police uniform, and it was his responsibility to enter and secure apartment C for the other officers. Officer Johnson testified that, while he went to apartment C, Lieutenant Jones approached the four men on the nearby porch. Later, he assisted Lieutenant Jones by searching the [Petitioner], to ensure officer safety, and he noticed a bulge in the [Petitioner's] pocket of his pants. Officer Johnson testified that the [Petitioner] told him that the

bulge was money, and the [Petitioner] gave the officer permission to remove the money. The officer explained that he removed two bunches of money totaling $5921, $2000 of which was wrapped in a white grocery bag secured by rubber bands. He testified that the [Petitioner] also had keys and a driver's license in his pocket, and he removed all of these items and placed them on the sidewalk. Officer Johnson testified that he was present when Lieutenant Jones inquired about the Monte Carlo, and no one responded.

Officer Johnson testified that the K-9 officer and dog arrived to examine two vehicles, one in front of the apartment and the black Monte Carlo located on the street. He said that the dog gave a positive alert to the presence of the odor of narcotics. He said that the dog scratched the door of the Monte Carlo, and Lieutenant Jones opened the door with the [Petitioner's] keys. The dog again alerted positively to the presence of narcotics in the console area, where they found a bag containing approximately 59 grams of cocaine. The officer also found in the car drug scales, a .9 millimeter handgun, a bag containing about $36,000, dryer sheets, some baggies, and paperwork on the vehicle. He testified that the money seized totaled $43,886.

<u>Jackson</u>, 2009 WL 839299 at *2-3 (emphasis added). The state courts' other factual findings are set forth in the analysis of Petitioner's specific claims.

## 2. Conclusions of Law

Tthe Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended the federal habeas statute, 28 U. S. C. § 2254, to issue the writ to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In addition, for claims that have been "adjudicated on the merits in State court proceedings", the writ shall not issue unless the state courts' decisions

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

<u>Id.</u> In sum, a federal court is bound by a state court's adjudication of a petitioner's claims unless the

state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable view of the facts. Harris v. Stovall, 212 F.3d 940, 943 (6th Cir. 2000)

The Court must presume the correctness of state court factual determinations, and the Petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). This presumption applies with equal force to credibility determinations by the state courts. Thompson v. Keohane, 516 U.S. 99, 111 (1995); Skaggs v. Parker, 235 F.3d 261, 266 n(6th Cir. 2000). The Sixth Circuit "give[s] complete deference to state court findings unless they are clearly erroneous." Cremeans v. Chapleau, 62 F.3d 167, 169 (6th Cir.1995) , abrogated on other grounds Thompson v. Keohane, 516 U.S. 99, 111 (1995). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" Cullen v. Pinholster, ——U.S. ——, ——, 131 S.Ct. 1388, 1398 (2011) (quoting Harrington v. Richter, 562 U.S. ——, —— 131 S.Ct. 770, 786 (2011); Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam). Review under § 2254(d)(1) is also limited to the record that was before the state court that adjudicated the claim on the merits. Cullen, 131 S.Ct. at 1399.

A state-court decision will be "contrary to" clear established federal precedent only if the state court "applies a rule that contradicts the governing law set forth in our cases" or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405–06 (2000). Under the "unreasonable application" clause of § 2254(d)(1), habeas relief is available if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions

but unreasonably applies that principle to the facts of the prisoner's case," or if a "state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." Harris v. Haeberlin, 526 F.3d 903, 909 (6th Cir.2008) (citations and internal quotation marks omitted).

The Supreme Court has explained that a state-court factual determination is not "unreasonable" merely because the federal habeas court would have reached a different conclusion. Wood v. Allen, 558 U.S. 290 (2010). The mere fact that "[r]easonable minds reviewing the record might disagree" about the factual finding in question "does not suffice [on habeas review] to supersede the trial court's . . . determination." Rice v. Collins, 546 U.S. 333, 341–42 (2006). Thus, a state court's factual determinations "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller–El v. Cockrell, 537 U.S. 322, 340, (2003). A state court's application of federal law is "unreasonable" and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### a. The **Blakely** Claim

Petitioner contends his sentence violates Blakely v. Washington, 542 U.S. 296 (2004), because his sentence was enhanced from 35 years to 36 years based on enhancement facts that were not found by the jury. On direct appeal, the Tennessee Court of Criminal Appeals addressed this claim:

The United States Supreme Court's recent opinion in Blakely calls into question the

14

continuing validity of our current sentencing scheme. In that case, the Court, applying the rule in Apprendi v. New Jersey, 566 U.S. 466, 490 (2000), struck down a provision of the Washington sentencing guidelines that permitted a trial judge to impose an "exceptional sentence" upon the finding of certain statutorily enumerated enhancement factors. 124 S.Ct. at 2537. The Court observed that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. Finally, the Court concluded that "every defendant has a **right** to insist that the prosecutor prove to a jury [beyond a reasonable doubt] all facts legally essential to the punishment." Id. at 2539. This Court has held that Blakely violations are subject to a Constitutional harmless error analysis. State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *24 (Tenn.Crim.App., at Nashville, Nov. 30, 2004), no perm. app. filed. "While it is true that Blakely concerns the inviolate right to a jury trial, the cornerstone upon which our criminal justice system was constructed, we cannot say that a jury's failure to determine an enhancement factor 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.' " Id. (quoting Needer v. United States, 527 U.S. 1, 9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Thus, before we modify a defendant's sentence, we will "review the Blakely errors to determine whether they were harmless beyond a reasonable doubt." Id.; see Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

First, we note that the Defendant has not waived this issue. We have held that, because Blakely announced a new rule, any defendant whose case was still on direct appeal could raise this issue. Walters, 2004 WL 2726034, at *19. We explained that, although Blakely was the Supreme Court's explanation of its prior decision in Apprendi, the Tennessee Supreme Court had previously announced that the rule in Apprendi did not affect our State's sentencing scheme. Id. As a result, the mandate of Blakely created a new rule in Tennessee. Id. Furthermore, in Walters, this Court held that Blakely could be raised in all cases on direct appeal, because a violation of this mandate was plain error arising from the deprivation of the Constitutional right to a jury trial. Id.; see also State v. Charles Benson, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *7-10 (Tenn.Crim.App., at Nashville, Oct. 8, 2004), no perm. app. filed. Thus, because the Defendant did not waive this issue, the question becomes whether the sentence imposed by the trial court violates the United States Supreme Court mandate in Blakely.

**The trial court applied enhancement factor (2) based on the Defendant's admission in the pre-sentence report of previous criminal behavior, specifically, that he had used marijuana on several occasions**. We note that this Court has held that there is a distinction for Blakely purposes between previous criminal convictions and a previous history of criminal behavior. State v. Michael Paul Mondell, No. E2003-02791-CCA-R3-CD, 2005 WL 378978, at *4 (Tenn.Crim.App., at Knoxville,

Feb. 17, 2005), no perm. app. filed. In that case, we held the trial court improperly applied this enhancement factor based upon the Defendant's previous history of criminal behavior when the Defendant had no prior record of criminal convictions. **Accordingly, in the case under submission, the trial court could not properly apply this enhancement factor based upon the Defendant's previous marijuana use unless this enhancement factor was admitted by the Defendant or submitted to a jury.**

**The record reflects that because the Defendant's two prior convictions were used to establish that he was a Range II multiple offender, the court's application of factor (2) was necessarily based upon the Defendant's statement to the pre-sentence report officer that he used marijuana on multiple occasions. We conclude that the trial court erred in its application of enhancement factor (2) because the Defendant's admission to prior drug use in the pre-sentence report does not contain "sufficient guarantees of trustworthiness ... without offending Blakely."** State v. Abel Torres, No. M2004-00559-CCA-R3-CD, 2005 WL 292431, at *8 (Tenn. Crim. App., at Nashville, Feb. 4, 2005), no perm. app. filed. **Therefore, the trial court's application of this enhancement factor was error, and we have concluded that the error was not harmless beyond a reasonable doubt.**

**The trial court also applied enhancement factor (9), that the Defendant "has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community," the trial court applied this factor because the Defendant committed this crime less than two years after he was previously convicted of possession of cocaine, and "he was back on the street doing the same thing [a]s what he was doing on some form of release...." We conclude that this factor was not admitted by the Defendant or found by a jury. Furthermore, as it is subject to Blakely, we conclude that the trial court erred when it applied this enhancement factor. This error, however, was harmless beyond a reasonable doubt.** The Defendant's pre-sentence report, which was admitted as an exhibit without objection during the sentencing hearing, indicates that the Defendant has had his probation revoked on one occasion. **The Defendant was convicted of selling drugs and was sentenced to eight years on probation on July 16, 1998. This Defendant was found guilty of a probation violation, and he was ordered to serve the sentence in prison. Further, the Defendant was also convicted of possession of cocaine on May 17, 1999 and was sentenced to twelve years. Accordingly, we conclude that the trial court's application of this factor was harmless beyond a reasonable doubt.**

Jackson, 2005 WL 839299 at *13-14.

Petitioner correctly contends the trial court's application of sentence enhancements were

16

errors and the Tennessee appellate court held that one error was not harmless. As to enhancement (2), the Tennessee appellate court stated "the trial court's application of this enhancement factor was error, and **we have concluded that the error was not harmless beyond a reasonable doubt**." Id. at *13 (emphasis added). Yet, the Tennessee appellate court affirmed Petitioner's sentence apparently concluding that collectively, such enhancement errors were harmless. The Court understands Petitioner's contention, but there were multiple enhancement errors and a Blakely error can be deemed harmless. "If a Booker/Blakely error is determined to be harmless as a result of an identical alternative sentence, this Court then must review a district court's sentencing determination for reasonableness". United States v. Duckro, 466 F.3d 438, 441 (6th Cir.2006) (citing Booker v. United States, 543 U.S. 220, 261 (2005) with other citation omitted).

In a word, Blakely does not prohibit enhancements based upon prior convictions as the Supreme Court held: "Any fact **(other than a prior conviction)** which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Booker, 543 U.S. at, 244 (emphasis added). Here, enhancement (9) was based upon Petitioner's prior convictions and under Blakely, this sentence enhancement is not a constitutional violation. In this context, the Court agrees with the state court's conclusion that the sentencing errors collectively are harmless and given the undisputed evidence Petitioner's prior convictions that can justify a sentence enhancement, there is not a violation of Blakely. Thus, the Court concludes the Tennessee Court of Criminal Appeals reasonably applied clearly established federal law.

### b. Insufficient Evidence Claim

Petitioner next contends the evidence at his trial did not support the jury's finding that he

knowingly possessed drugs within 1,000 feet of a school. The Tennessee Court of Criminal Appeals rejected this claim.

> We must first determine whether the State established beyond a reasonable doubt that the Defendant knowingly possessed a substance containing cocaine within 1000 feet of a school zone. Tennessee Code Annotated section 39-17-418(a), prohibiting possession of a controlled substance, "is not restricted to proof of actual possession, and evidence of either constructive possession or other control over the substance is sufficient to establish this element." State v. Ross, 49 S.W.3d 833, 845 (Tenn. 2001). Constructive possession of a drug is based upon the power and intention to exercise dominion and control over the drug, either directly or through others. Id. "In other words, „constructive possession is the ability to reduce an object to actual possession.." Id. at 845 (quoting State v. Transou, 928 S.W.2d 949, 955-56 (Tenn.Crim.App.1996) (citations omitted)). "As such, although a defendant's mere presence at a place where controlled substances are found will not support an inference of possession, a person in possession of the premises where controlled substances are found may also be presumed to possess the controlled substances themselves." Id. (citation omitted).

> Viewing the evidence in the light most favorable to the State, the evidence proves that the Defendant had constructive possession of the substance containing cocaine that was found in the Monte Carlo. See State v. Lonnie Walter Hurd, No. E2002-00832-CCA-R3-CD, 2003 WL 22303083, at *4 (Tenn. Crim. App., at Knoxville, Oct. 8, 2003), no perm. app. filed; see also State v. Brown, 915 S.W.2d 3, 7 (Tenn. Crim. App.1995) (holding that "[k]nowledge may be inferred from control over the vehicle in which the contraband is secreted"). After conducting a legal search of the Defendant, officers found a key to the Monte Carlo in his pocket. After a K-9 dog alerted to the presence of drugs in the Monte Carlo, the officers then conducted a legal search of the vehicle using the Defendant's key. When the officers searched the interior of the vehicle, they found a Sprint cell phone bill addressed to the Defendant. The Monte Carlo sales receipt was also found in the vehicle and was signed by the Defendant's mother, who was not present at the time these events occurred. The officers found a large quantity of money and a bag containing cocaine in the car. From this evidence, we conclude that a rational trier of fact could have found that the Defendant was in constructive possession of the Monte Carlo and its contents. Further, **Scott Cherry testified that, according to his two GPS measurements, the distance to the school from the property was between 939 feet and 947 feet. Therefore, we conclude that there was sufficient evidence that the Defendant knowingly possessed cocaine within a Drug-Free School Zone**.

Jackson, 2005 WL 839299 at *9 (emphasis added).

For an insufficiency of evidence claim, Jackson v. Virginia, 443 U.S. 307 (1979), set forth

the standard for relief.

> ...[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to `ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' Instead, **the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.** This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. **Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.** The criterion thus impinges upon `jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

Id. at 318-19 (emphasis added with footnotes and citations omitted).

A presumption of correctness obtains in determining whether there exists sufficient evidence

to support a conviction. If any rational finder of fact would accept the evidence as establishing each

essential element of the crime, the Jackson standard of review is satisfied. Id. at 324. The rule

concerning reasonable inferences applies with equal force to historical facts. Parke v. Raley, 506

U.S. 20, 35-36 (1992) (involving the challenge to a prior conviction that resulted in enhancement

of a sentence).

As to Petitioner's contention that the State did not prove that the Petitioner knowingly

possessed drugs within 1000 feet of a school, the Sixth Circuit held that a similar federal statute

does not require proof that the defendant actually knew the location of the school. "Whether

defendant knew that his drug transaction occurred within 1,000 feet of a protected location is

immaterial." <u>United States v. Grandberry</u>,43 Fed.Appx. 89, 893 (6th Cir. 2002) (citing <u>United States v. Cross</u>, 900 F.2d 66, 69 (6th Cir.1990) (holding that 21 U.S.C. § 845a, the precursor to § 860(a), does not require <u>mens rea</u> ). Here, Petitioner fails to show that the Tennessee Court of Criminal Appeals determination on the sufficiency of the evidence for his conviction is contrary to clearly established federal law. Thus, the Court concludes that Petitioner's sufficiency of the evidence claim lacks merit.

### B. Procedural Defaults and <u>Martinez</u> Claim

Respondent contends that the claims in Petitioner's amended petition and his motion to alter or amend are procedurally defaulted for Petitioner's failures to present those claims to the state courts. These challenged claims are: " (1) improper jury instructions; (2) actual innocence; and (3) the sum of Petitioner's ineffective assistance of counsel claims: (i) that his counsel failed to investigate adequately the accuracy of the GPS measurements placing Petitioner's alleged action within 1,000 feet of a school; (ii) that his counsel failed to effectively challenge the legality of the search and seizure of Petitioner's car; (iii) that his counsel failed withdraw from representation despite a conflict of interest; (iv) that his counsel failed to litigate adequately Petitioner's sufficiency of evidence claim on appeal; (v) that his counsel failed to adequately advise Petitioner with respect to the State's proposed plea agreement; (vi) that his counsel failed to call a defense witness; (vii) that his counsel failed to object to previously undisclosed testimony of Officer Flowers; and (viii) that his counsel failed to object to Officer Flowers' testimony regarding Petitioner's gambling". (Docket Entry No. 16, Petitioner Keith Jackson's Amended Petition, at 6-7).

Procedural Default Doctrine is an extension of the comity policy that underscores the exhaustion doctrine and bars consideration of a federal claim in a federal habeas action that was barred by

application of a state rule absent a showing of cause and prejudice. Coleman v. Thompson, 501 U.S.722, 750 (1992). The rationale for this doctrine arises out of federal respect for federalism and maintaining comity with state courts. Id. at 730-32. The Supreme Court further recognized that state procedural rules also serve a legitimate state interest in finality of criminal convictions. Francis v. Henderson, 425 U.S. 536, 542(1976). State procedural rules channel the controversy to the state trial and appellate courts and serve the State's interest in finality. Id. at 490-9. The procedural default doctrine applies only to firmly established and "regularly followed" state procedural rules. Johnson v. Mississippi, 486 U.S. 578, 587 (1988). If the state court did not determine whether a petitioner's claims were procedurally defaulted under state law, then the District Court is to consider whether the state court would bar the claims, if those claims were presented to the state courts. Engle, 456 U.S. at 125-26, n.26. If the state decision is unclear, then the same rule obtains and the Court examines the briefs of the parties in the state courts. Bagby v. Sowders, 853 F.2d 1340, 1348 (6th Cir. 1988).

Once procedural default on a state rule is established, the federal petitioner must establish cause and prejudice to excuse such non-compliance. Carrier, 477 U.S. at 488. If a petitioner's claims are procedurally barred, the habeas petitioner must show "cause for the noncompliance" and "actual prejudice resulting from the alleged constitutional violation." Wainwright v. Sykes, 433 U.S. 72, 84 (1977). Procedural default may also be excused "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496. The procedural default doctrine also does not preclude federal habeas review if the petitioner has an error-free trial, but makes a showing of actual innocence of the offense with clear and convincing evidence that reveals a fundamental miscarriage of justice. Sawyer v.

Whitley, 505 U.S. 333, 336 (1992).

In the Sixth Circuit, the analysis under the procedural default doctrine was set forth in the

oft-cited Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986):

> When a state argues that a habeas claim is precluded by the petitioner's failure to observe a state procedural rule, the federal court must go through a complicated analysis. First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> *   *   *
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction.
>
> *   *   *
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims.

Id. at 138 (emphasis added)

In his post conviction proceedings, Petitioner who had counsel, raised numerous claims

of ineffective assistance of his trial counsel, as summarized by the Tennessee appellate court:

> On October 26, 2005, the Petitioner filed a pro se petition for post-conviction relief alleging that he did not receive the effective assistance of counsel at trial. Ultimately, counsel was appointed, and an amended petition was filed. As specific grounds for relief, the Petitioner averred that trial counsel was constitutionally ineffective for failing to: (1) challenge the validity, truth, and sufficiency of the affidavit of complaint in support of the search warrant; (2) call certain defense witnesses at trial; (3) conduct reasonable investigation of the Petitioner's case; (4) prepare the Petitioner for testifying at the suppression hearing; (5) withdraw as counsel after a disagreement between the Petitioner and counsel, raising a conflict of interest; (6) object to a State's witness called at trial, not listed on the indictment or provided for on any prior witness list; (7) object to hearsay testimony from Lt. Jones about statements made by other officers at the crime

22

scene; (8) inform the Petitioner that he could hire a private investigator; and (9) challenge inconsistent statements made by the State's witnesses. He further contended that he was denied due process of law due to counsel's failure to object to evidence admitted at trial: Lt. Jones' hearsay testimony about statements made by other officers at the scene; Lt. Jones' unsubstantiated testimony that the men appeared to be gambling when officers arrived on the scene; and inadmissible testimony from a witness regarding procedures for "chain of custody evidence examinations and  storage of seized narcotics." Finally, the Petitioner argued that he was denied a fair  trial because (1) a mistake was made in the jury charge; (2) the prosecutor made improper comments during closing argument; (3) the State failed to fingerprint  evidence seized from the Petitioner at the scene; and (4) seizure of the Petitioner's keys at the scene amounted to an unreasonable search and seizure.

Jackson, 2009 WL 276781 at *3 (footnote omitted).

In his amended petition and motion to alter or amend, Petitioner asserts the following ineffective assistance of counsel claims: "(2) his [post conviction counsel's] procedural default of two ineffective-assistance-of-trial-counsel claims – one alleging ineffectiveness in litigating the motion to suppress and the other alleging ineffectiveness in advising him about the state's plea offer –should be excused under Martinez v. Ryan; (3) he is entitled to relief on the merits of his claim that trial counsel was ineffective for failing to adequately litigate the motion to suppress; and (4) he is entitled to an evidentiary hearing to develop a record to support his claim of ineffective assistance of counsel at the plea bargaining stage". (Docket Entry No. 34, Petitioner's Memorandum at 1).

From the Court's review of the state record, Petitioner's claims of ineffective assistance of counsel, improper jury instructions, and actual innocence  were not presented in his direct appeal nor his post conviction appeal.  Petitioner also did not present these claims to the Tennessee Supreme Court after the state appellate court affirmed  his conviction. Thus, under Tenn. Code Ann. § 40-30-106(g), the claims are deemed waived.  Under that statute, "[a] ground

for relief [in] in a post-conviction proceeding] is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction," as here, on appeal from the judgment of the trial court. Tenn. Code Ann. § 40-30-106(g). The Sixth Circuit found that the Tennessee waiver statute, Tenn. Code Ann. § 40-30-106(g), to be an independent and adequate state rule that is regularly enforced. Cone v. Bell, 243 F.3d 961, 969 (6th Cir. 2001), overruled on other grounds by Bell v. Cone, 535 U.S. 685 (2002)).

To show cause, Petitioner must show that some objective factor impeded his counsel's compliance with the State's procedural rule. See id. at 488. Objective factors include interference by public officials, ineffective assistance of counsel, of unavailability of factual or legal basis for a claim. Id. Where a Petitioner "makes no argument that this procedural default should be excused, under either the cause-and-prejudice or miscarriage of justice exceptions" these claims shall be dismissed. Rayner v. Mills, 685 F.3d 631, 644 (6th Cir. 2012). Petitioner must also prove prejudice to excuse his post-conviction counsel's failure to present this claim to the state court. Petitioner must prove that he was "actually prejudiced by the alleged constitutional error," Maupin, 785 F.2d at 138. The Supreme Court refers to the definition of "prejudice," as "expressly leaving to future cases further elaboration of the significance of that term." United States v. Frady, 456 U.S. 152, 168 (1982) (quoting Wainwright, 433 U.S. at 91). Prejudice can be demonstrated by a showing of ineffective assistance of counsel. Hill v. Lockart, 474 U.S. 52, 58-59 (1985).

As to Petitioner's reliance on Martinez, there, the Supreme Court created an equitable exception to procedural default that "qualifies Coleman **by recognizing a narrow exception**:

Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315 (emphasis added). In addition, Martinez applies to "initial-review collateral proceedings", "which provide the first occasion to raise a claim of ineffective assistance at trial." Id. Martinez expressly recognized that "[d]irect appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the [ineffective assistance of trial counsel] claim." Id. at 1318. In Trevino v. Thaler, __ U.S.__, 133 S. Ct. 1911 (2013), the Supreme Court extended the Martinez exception where State law "does not expressly *require* the defendant to raise a claim of ineffective assistance of trial counsel in an initial *collateral review* proceeding....[but the State] law on its face appears to permit (but not require) the defendant to raise the claim on *direct appeal*." Id. at 1915. (emphasis in the original). Moreover, "[t]o be successful under Trevino, moreover, [the habeas petitioner] must show a 'substantial claim of ineffective assistance, Trevino, 133 S.Ct. at 1918, and this requirement applies as well to the prejudice portion of the ineffective assistance claim. [the habeas petitioner's] claim, for the reasons given in the next section, is likely not sufficiently substantial to meet this element of the Martinez exception". McGuire v. Warden, Chillicothe Correctional Inst.738 F.3d 741, 752 (6th Cir. 2013). (quoting Trevino, 133 S.Ct. at 1918)

Based upon an analysis of Tennessee's system, this member of the Court concluded, consistent with Trevino, that Tennessee's system by "'design and operation makes it **highly unlikely** in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal'." Morrow v. Brandon, No. 3:06–0955, 2014 WL 49817 at *9 (M. D. Tenn. Jan. 7, 2014) (quoting Trevino, 133 S. Ct. at 1921and citing

Fenton v. Colson, No. 3:09cv1057, 2013 WL 704317 at *13 (M. D. Tenn. Feb. 25, 2013) (emphasis in Brandon). In Sutton v. Carpenter, No. 12–6310, 2014 WL 1041695 (6th Cir. March 19, 2014), the Sixth Circuit ruled that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial. Id. at *7 (citing Martinez, 132 S. Ct. at 1320). Yet, "[t]o be successful under Trevino, moreover, [the habeas petitioner] must show a "substantial" claim of ineffective assistance, Trevino, 133 S.Ct. at 1918, and this requirement applies as well to the prejudice portion of the ineffective assistance claim. [the habeas petitioner's] claim, for the reasons given in the next section, is likely not sufficiently substantial to meet this element of the Martinez exception". Although Petitioner's claims about his post conviction counsel may be raised under Martinez, the necessity of an evidentiary hearing on Petitioner's claims about his counsel is a separate issue.

## 1. The **Martinez** Claims

For Petitioner's defaulted ineffective assistance of counsel claims, the Tennessee trial and appellate court made relevant factual findings to these Martinez claims. The Tennessee appellate court first quoted the state trial court's findings:

> The post-conviction court concluded that the Petitioner failed to prove his allegations by clear and convincing evidence, ruling as follows:
>
> The [P]etitioner now contends that he was denied effective assistance of counsel with regard to representation afforded in his defense. First, the [P]etitioner specifically claims that counsel was ineffective for failing to challenge the validity, truth and sufficiency of the affidavit of complaint and the wiretap order. However, these matters were addressed by suppression motion prior to trial as well as on appeal and found to be without merit. The claim cannot survive post-conviction[.]
>
> The [P]etitioner's second issue rests on the assertion that counsel's representation was

26

inadequate in the failure to thoroughly investigate the facts and subpoena certain witnesses at trial. However, the [P]etitioner failed to call any of these witnesses at the evidentiary hearing in this matter, thus precluding the [c]ourt's consideration of their testimony which would have been purportedly beneficial to the [P]etitioner. Furthermore, **Mr. Kenneth Quillen stated that he had thoroughly examined the [S]tate's evidence against the [P]etitioner, including the witnesses they presented. He stated that he conferred at length with Mr. Dale Quillen regarding all of the witnesses and that the [P] etitioner did not seem to have any problems with or complaints by the [P]etitioner.**

Another assertion by the [P]etitioner regarding counsel's alleged failure to prepare a defense is based on the fact that no private investigator was employed to assist in the case. It is uncertain as to how an investigator would have provided any assistance in this case considering the circumstances. **The [P]etitioner was undoubtedly the individual arrested at the scene and that he was in possession of large amounts of cash and cocaine. The only other factor that the [S]tate had to prove was that the possession occurred within 1,000 feet of a school zone. Mr. Kenneth Quillen testified that he researched the lot lines and property data in the Office of the Property Assessor in an attempt to establish a defense to the charges, but was unsuccessful.**

By testimony adduced at the hearing in this matter, **it was revealed that the [P]etitioner was offered a sentence of 13 years if he wished to enter a guilty plea. The [P]etitioner, by his own admission, refused the offer because it was not good enough. He testified that he thought it would be worth the risk to try the case rather than accept a plea agreement with such a lengthy sentence. Both of the [P]etitioner's attorneys advised him that it would be in his best interest to accept the plea offers, but he did not wish to accept them. Now that the [P]etitioner is serving a 36-year sentence at 100%, he complains of ineffective assistance of counsel. The fact is that Kenneth Quillen provided the [P] etitioner with such exceptional legal representation by successfully appealing the firearm conviction and ultimately garnering a dismissal of the charge.**

Jackson, 2009 WL 276781 at *4 (emphasis added).

At the Martinez hearing in this action, Petitioner testified that he dropped out of school in the eleventh grade that he had to repeat. Petitioner testified that his trial counsel did not review with him the elements of the offense or the testimony of state witnesses. Although Petitioner has two prior drug convictions, Petitioner testified that he was unfamiliar with trial proceedings and

did not understand the concept of constructive possession that was the State's trial theory for his conviction. According to Petitioner, his trial counsel did not explain the concept of constructive possession Petitioner admitted that his trial counsel informed him of the State's plea offer of 13 years, but Petitioner asserted his belief that the search of his person was unjustified and that the police officers lacked justification to search the vehicle. Petitioner also stated that he was unaware that there was a school in the area where the officers found Petitioner and the drugs. Petitioner was dissatisfied with his first counsel, Dakle Quillen, but Kenneth Quillen, the son assumed primary responsibility for Petitioner's trial.

At the <u>Martinez</u> hearing, Kenneth Quillen could not recall if he reviewed the testimony of state witnesses with Petitioner prior to trial nor if he informed Petitioner of the elements of the offense or the concept of constructive possession. Yet, the state courts found that "Mr. Kenneth Quillen stated that he had thoroughly examined the [S]tate's evidence against the [P]etitioner, including the witnesses they presented. He stated that he conferred at length with Mr. Dale Quillen regarding all of the witnesses and that the [P]etitioner did not seem to have any problems with or complaints". <u>Jackson,</u> 2009 WL 276781 at *4. A letter from Dale Quillen to Petitioner outlined the state's plea offer and attached thereto a copy of the Tennessee statute under which the Petitioner was charged. (Petitioner Exhibit No. 1. ) Kenneth Quillen admitted that he could have better presented his Fourth Amendment challenge on the permissible scope of the police officer's search of Petitioner under the search incident to arrest doctrine.

As to Petitioner's claim about the inadequacy of his counsel's challenge to the search of

28

his person and the vehicle the key to which was found on Petitioner[4]. In the post conviction

appeal, the Tennessee appellate court reviewed the trial court's analysis of the claim:

I. Suppression of the Evidence

First, the Petitioner contends that the trial court erred in finding that his illegal search and seizure argument had been previously determined and, accordingly, in denying him the opportunity to present evidence supporting that argument. In his brief, he contends that, at the post-conviction hearing, he raised "new arguments for improper suppression of the evidence, based upon lack of consent and lack of probable cause of the arresting [officer] to search the vehicle...."

Despite his contention, the Petitioner seeks to reexamine the same grounds presented at the suppression hearing-lack of consent to search the Petitioner's person and lack of probable cause to search the Petitioner's automobile. We cite to the thorough analysis of this Court's review of the Petitioner's suppression issues on direct appeal:

**Pretrial, the [Petitioner] filed a motion to suppress the weapon found in the [Petitioner's] vehicle. As grounds, the [Petitioner] alleged: (1) the law enforcement officers lacked any authority to search the [Petitioner]; and (2) the law enforcement officers entered the vehicle without authority and without a warrant. Specifically, the [Petitioner] argues that the search conducted of him and the subsequent search of the vehicle was warrantless, nonconsensual, and did not fall within any of the recognized exceptions to the Fourth Amendment protection against unreasonable searches and seizures and, as such, that all evidence derived from that search is inadmissible.** The trial court conducted an evidentiary hearing and denied the motion. **The trial court held**:

My recollection ... is that once an individual denies any interest in the automobile, they have the right to search and to use anything, even though he might come along later and prove that it was his

---

[4] This claim converts a Fourth Amendment claim into a Sixth Amendment claim for ineffective assistance of counsel. Under Stone v. Powell, 428 U.S. 465 (1976), Petitioner cannot assert a Fourth Amendment claim in a habeas action, where, as here, Petitioner had a fair opportunity to present that claim in the state courts.. To assess the ineffective assistance of counsel claim the Court must effectively decide a Fourth Amendment claim that Powell appears to preclude. Yet Powell's restriction does not apply to Sixth Amendment ineffective assistance of counsel claims related to search issues. Kimmelman v. Morisson, 477 U. S. 365, 376-77 (1986)

automobile or that he had interest in the automobile.

And **the proof right now before me is that everybody out there denied anything to do with the automobile. That's the proof before me.**

[T]wo officers have testified that everybody said they didn't have anything to do with that vehicle, whose automobile is that? I don't know, is what they said. Then later on this gentleman says, after the search, this gentleman says it's my mother's automobile. That's where we are as far as the automobile is concerned.

Jackson, 2009 WL 276781 at *6.

The Tennessee appellate court then quoted its disposition if the search issue in

Petitioner's direct appeal that applied federal law, including Terry v. Ohio, 392 U.S. 1 (1968)

1. Stop of the [Petitioner]

We must first determine whether the detention of the [Petitioner] by the police officer amounted to a seizure. If so, we must then determine whether the officer possessed an articulable reasonable suspicion for an investigatory stop under Terry and its progeny. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry [v. Ohio], 392 U.S. [1,] 19 n. 16; State v. Hord, 106 S.W.3d 68, 70 (Tenn.Crim.App.2003). The Supreme Court stated that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States v. Mendenhall, 446 U.S. 544, 554; Hord, 106 S.W.3d at 71. In the case under submission, it is clear that the [Petitioner] was "seized" within the meaning of the State and Federal Constitutions. Officer Jones testified that he ordered the [Petitioner] to return to the apartment, made the [Petitioner] lay on the ground, and handcuffed the [Petitioner]. Therefore, it is clear that the [Petitioner] was "seized" within the meaning of the Terry decision. Thus, for the seizure and subsequent search of the [Petitioner] to be constitutionally permissible, the officer must have had reasonable suspicion, supported by articulable facts, that the [Petitioner] had committed, or was about to commit a criminal offense.

In **our view, under this totality of the circumstances test, Lieutenant Jones's warrantless seizure and search of the [Petitioner] was permissible as a "stop and frisk" exception to the warrant requirement. When Lieutenant Jones**

arrived at the apartment building where a search warrant was to be executed, he observed the [Petitioner] and three other men on the stoop of another apartment in the building, gambling with dice. It was the lieutenant's responsibility to control these four men while the other officers searched apartment C. Controlling these men was necessary to ensure the other officers' safety. As Lieutenant Jones approached these men to control them, the [Petitioner] began to put something in his pockets and walk away from the lieutenant. The [Petitioner] then began to run down the street, and the lieutenant drew his gun and ordered the [Petitioner] to get on the ground. The [Petitioner] went about fifty yards, then stopped, and returned to the apartment. The [Petitioner's] behavior established a reasonable suspicion that the [Petitioner] was engaged in unlawful conduct, therefore, Lieutenant Jones was justified in ordering the [Petitioner] to return to the apartment. Further, Officer Johnson testified that he "did a pat down" search of the [Petitioner] for officer safety, and he noticed a bulge in the [Petitioner's] pants. The officer removed the bulge which was $5921 in currency, and $2000 of that amount was wrapped in a white bag with rubber bands around it. We conclude, therefore that the search of the [Petitioner] was permissible based on the "stop-and-frisk" exception to the warrant requirement. Accordingly, we must next determine whether the subsequent search of the [Petitioner's] vehicle was also permissible.

2. Search of the Vehicle

The [Petitioner] further contends that the police officers had no authority or basis to conduct a search of his car. Our Supreme Court has previously held that "a canine sweep around the perimeter of a vehicle which has been legally detained does not constitute a search, and thus, does not require probable cause or reasonable suspicion...." State v. England, 19 S.W.3d 762, 764 (Tenn.2000); see also Timothy Rathers v. State, No. W2000-02177-CCA-R3-PC, 2002 WL 1549771, at *6 (Tenn.Crim.App., Jackson, Jan. 18, 2002). In order to find that an officer had probable cause to search a vehicle based upon a positive alert by a trained drug detection dog, the dog's reliability must be established. [ England, 19 S. W.3d] at 768; see also State v. John David Smith, No. W2003-01200-CCA-R3-CD, 2004 WL 737532, at *4 (Tenn.Crim.App., Jackson, April 6, 2004), perm. app. denied (Tenn.2004). This includes consideration of the dog's training, the officer's training and experience with the dog, and the record of false negative and false positive alerts. [England, 19 S.W.3d at 768].

At trial, Officer Johnson testified that he was present when Lieutenant Jones inquired about the vehicle parked out front, and Officer Johnson said that there was no answer from any of the men about the vehicle. Based on their

findings from the initial search of the [Petitioner], including a key that fit the
vehicle, the officers subsequently contacted the K-9 unit to perform a sweep
on the vehicle. At trial, Officer Spencer testified about Rocky's training and
his own training as a handler of K-9 dogs. The officer stated that Rocky was
assigned to him in 2001, and he and Rocky are recertified every year as a K-9
handler team by the United States Police K-9 Association. We conclude that,
since training and reliability were established, the police had probable cause
to search the vehicle upon the canine's alert on the passenger's door. Id. at
768-69. This issue is without merit.

Jackson, 2005 WL 839299, at *4-7.

Claims which have been previously determined cannot establish a basis for
post-conviction relief. Tenn.Code Ann. § 40-30-106(f). "A ground for relief is
previously determined if a court of competent jurisdiction has ruled on the merits
after a full and fair hearing. A full and fair hearing has occurred where the
petitioner is afforded the opportunity to call witnesses and otherwise present
evidence, regardless of whether the petitioner actually introduced any evidence."
Tenn.Code Ann. § 40-30-106(h).

A suppression hearing was held before the trial court. After considering the
evidence presented, the trial court denied the motion to suppress. A panel of this
Court affirmed that decision. We agree with the post-conviction court that the
issue has been previously determined, foreclosing further review

Id. at ** 6, 7.[5]

---

[5] The England decision cited by the Tennessee appellate court relied extensively on federal
law.

"It is well-settled that an investigative stop of an automobile is constitutional so long as law
enforcement officials have a reasonable suspicion, supported by specific and articulable facts,
that the occupants of the vehicle have committed, are committing, or are about to commit a
criminal offense. United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d
621 (1981); Delaware v. Prouse, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 ...
In this case, both parties agree with the lower courts' conclusion that the initial stop of
England's pick-up truck was a legal stop, based upon his violation of the license plate light
law, Tenn.Code Ann. § 55–9–404. Accordingly, the lower courts correctly concluded that
the initial stop of England's vehicle was reasonable.

Reasonableness of Detention for Canine Sweep,
We now turn to the question of whether the reasonable stop and detention of England's

In 2013, in Bailey v. United States, 133 S. Ct. 1031 (2013), the Supreme Court describe

the state of the Fourth Amendment law on the seizure or search of a person in the area where the

police officers were executing a search warrant. In Bailey, "the petitioner left the apartment

before the search began; and **the police officers waited to detain him until he was almost a**

**mile away**. The issue is whether the reasoning in Summers can justify detentions beyond the

immediate vicinity of the premises being searched". Id. at 1038 (emphasis added).

> The Fourth Amendment, applicable through the Fourteenth Amendment to the
> States, provides: "The right of the people to be secure in their persons ... against
> unreasonable searches and seizures, shall not be violated, and no Warrants shall
> issue, but upon probable cause ... particularly describing the place to be searched,
> and the persons or things to be seized." This Court has stated "the general rule that
> Fourth Amendment seizures are 'reasonable' only if based on probable cause" to
> believe that the individual has committed a crime. Dunaway v. New York, 442
> U.S. 200, 213, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The standard of probable
> cause, with "roots that are deep in our history," Henry v. United States, 361 U.S.
> 98, 100, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), "represent[s] the accumulated

---

vehicle for a traffic violation was rendered unreasonable by the officer's use of the drug
canine. In the trial court and the Court of Criminal Appeals, England argued that the canine
sweep constitutes an unlawful search. He abandoned that position at oral argument before
this Court and now concedes that a canine sweep is not a search. We agree. As the trial court
observed:


The case of U.S. v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) stands for
the proposition that there is no expectation of privacy in contraband and a dog sniff does not
violate any privacy interest and is, therefore, not a search under the Fourth
Amendment.United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983);
United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Though the
Place case involved the use of canines in airports to investigate luggage, the rule has been
applied in the context of canine sweeps around the perimeter of a legally detained vehicle.
Accord, e.g., United States v. Holloman, 113 F.3d 192, 194 (11 th Cir.1997); United States
v. Jeffus, 22 F.3d 554, 557 (4 th Cir.1994); United States v. Seals, 987 F.2d 1102, 1106 (5
th Cir.1993); United States v. Rodriguez–Morales, 929 F.2d 780, 788 (1 st Cir.1991); United
States v. Stone, 866 F.2d 359, 363 (10 th Cir.1989). We conclude that the canine sweep did
not constitute a search under the Fourth Amendment and therefore required neither probable
cause nor reasonable suspicion." 19 S. W. 3d at 766-67

wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest 'reasonable' under the Fourth Amendment." Dunaway, supra, at 208, 99 S.Ct. 2248.

Within the framework of these fundamental rules there is some latitude for police to detain where "the intrusion on the citizen's privacy 'was so much less severe' than that involved in a traditional arrest that 'the opposing interests in crime prevention and detection and in the police officer's safety' could support the seizure as reasonable." Summers, supra, at 697–698, 101 S.Ct. 2587 (quoting Dunaway, supra, at 209, 99 S.Ct. 2248); see also Terry, supra, at 27, 88 S.Ct. 1868 (holding that a police officer who has reasonable suspicion of criminal activity may conduct a brief investigative stop).

In **Summers**, the Court defined an important category of cases in which detention is allowed without probable cause to arrest for a crime. It **permitted officers executing a search warrant "to detain the occupants of the premises while a proper search is conducted."** 452 U.S., at 705, 101 S.Ct. 2587. **The rule in Summers extends farther than some earlier exceptions because it does not require law enforcement to have particular suspicion that an individual is involved in criminal  activity or poses a specific danger to the officers**. Muehler v. Mena, 544 U.S. 93, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005). **In Muehler, applying the rule in Summers, the Court stated: "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.' "** 544 U.S., at 98, 125 S.Ct. 1465 (quoting Summers, supra, at 705, n. 19, 101 S.Ct. 2587). **The rule announced in Summers allows detention incident to the execution of a search warrant "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial."** Muehler, supra, at 98, 125 S.Ct. 1465.

**In Summers and later cases the occupants detained were found within or immediately outside a residence at the moment the police officers executed the search warrant. In Summers, the defendant was detained on a walk leading down from the front steps of the house.**

Id. at 1037-38.

Under the AEDPA, this Court must consider the clearly established decisions of the

Supreme Court  at the time of Petitioner's trial and appeal. In Bailey, the Supreme Court stated,

**"the occupants detained were found within or immediately outside a residence at the**

34

moment the police officers executed the search warrant. **In Summers, the defendant was detained on a walk leading down from the front steps of the house".** Id at 1037. Here, under Bailey given Petitioner's presence on the porch of the residence to be searched pursuant the search warrant, the Court concludes that police officers could "detain" Petitioner.

As to probable cause to search an occupant found outside the immediate area of the premises to be searched, "Summers extends farther than some earlier exceptions because it **does not require law enforcement to have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers" Id.** Thus, given proof that Petitioner was on the stoop of the residence to be searched under the search warrant, the police officers clearly could detain and search Petitioner. As to the search of Petitioner's person, the Tennessee appellate court concluded that

> **The [Petitioner's] behavior established a reasonable suspicion that the [Petitioner] was engaged in unlawful conduct, therefore, Lieutenant Jones was justified in ordering the [Petitioner] to return to the apartment. Further, Officer Johnson testified that he "did a pat down" search of the [Petitioner] for officer safety, and he noticed a bulge in the [Petitioner's] pants. The officer removed the bulge which was $5921 in currency, and $2000 of that amount was wrapped in a white bag with rubber bands around it. We conclude, therefore that the search of the [Petitioner] was permissible based on the "stop-and-frisk" exception to the warrant requirement. Accordingly, we must next determine whether the subsequent search of the [Petitioner's] vehicle was also permissible.**

Jackson, 2009 WL 276781 at *

Bailey again restated the governing law on the permissible extent of police officers' search of persons on the premises of the place to be searched pursuant to a search warrant.

> **In Summers, the Court recognized three important law enforcement interests** that, taken together, justify the detention of an occupant who is on the premises **during the execution of a search warrant: officer safety**, facilitating the

35

completion of the search, and preventing flight. 452 U.S., at 702–703, 101 S.Ct. 2587.

**The first interest identified in Summers was "the interest in minimizing the risk of harm to the officers." Id., at 702, 101 S.Ct. 2587. There the Court held that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence," and "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id., at 702–703, 101 S.Ct. 2587.***

133 S. Ct at 1038

To serve this interest, the Supreme Court explained that " The first interest identified in Summers was "the interest in minimizing the risk of harm to the officers." Id., at 702, 101 S.Ct. 2587. [Summers] held that 'the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence,' and '[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.' When law enforcement officers execute a search warrant, safety considerations require that they secure the premises, which may include detaining current occupants. By taking 'unquestioned command of the situation,' **the officers can search without fear that occupants**, who are on the premises and able to observe the course of the search, will become disruptive, dangerous, or otherwise frustrate the search". Id. (internal citations omitted).

Here, the police officer described Petitioner and others as gambling on the stoop of the house to be searched. Such facts alone would justify a Terry search. As the Sixth Circuit explained in United States v. Bohannon, 225 F.3d 615, 617 (6th Cir. 2000) that with the search warrant to search the residence attached to the stoop, "[a]lthough Summers itself only pertains to

a resident of the house under search, it follows that **the police may stop people coming to or going from the house** if police need to ascertain whether they live there." Baker v. Monroe Township, 50 F.3d 1186, 1192 (3d Cir.1995). The policy justifications in Summers and Fountain, to protect officers' safety, are applicable hers as "[t]he possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it **would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances**." Id. (quoting United States v. Patterson, 885 F.2d 483, 485 (8th Cir.1989))

Here, the Tennessee appellate courts considered the relevant constitutional principles and found that the officer safety considerations and Petitioner's movements justified the search of Petitioner's person. The bulge on Petitioner's pants could reasonably be examined to assure officer safety. The large amount of cash found in petitioner's pants is consistent with drugs at the residence. With the key found in petitioner's pants and the other facts, the officer would have reasonable basis to ascertain if Petitioner were tied to the vehicle. The mere fact that Petitioner's counsel was able to require a Fourth Amendment analysis was significant because in the earlier state proceedings, Petitioner did not assert any interest in the automobile when the police officer asked the persons on the stoop about who owned the vehicle.

Petitioner next contends his trial was ineffective in allowing an improper jury instruction in violation of his due process rights. This claim was not sufficiently presented to the state courts and is barred under Coleman. State procedural rules that channel the controversy to the state trial and appellate courts must be honored because failure to do so "deprives the [state] appellate court of an opportunity to review trial error, and 'undercut[s] the State's ability to enforce its procedural rule[s]'" Murray, 477 U.S. at 491. Tennessee's waiver statute has been held to serve a legitimate

state interest and is regularly enforced for purposes of procedural default. See Hutchison v. Bell, 303 F.3d 720, 738 (6th Cir. 2002). Petitioner did not sufficiently present this claim before the state courts, and under state rules that claim is waived. Thus, under Coleman, the Court concludes this claim is procedurally barred without any showing of cause or prejudice. This claim is not a substantial claim to qualify for review under Martinez . Moreover, Petitioner failed specify any facts supporting this claim as he failed identify the specific instruction he found improper.

Finally, Petitioner presents a claim of actual innocence. The procedural default doctrine may not preclude federal habeas review if failure to hear the petitioner's defaulted claim would result in a fundamental miscarriage of justice or would prove his actual innocence of the offense. Sawyer v. Whitley, 505 U.S. 333, 339 (1992). If there were an error-free trial and the actual innocence claim was based upon newly discovered evidence, then the petitioner's showing of actual innocence must be "truly persuasive" or "extraordinarily high" to show a "constitutionally intolerable event" as well as the lack of an available state remedy. Herrera v. Collins, 506 U.S. 390, 427 (1993).

Actual innocence claims must be substantive or factual, not procedural, such as a claim of innocence based on ineffective assistance of counsel or a prosecutor's failure to disclose Brady material is procedural and subject to the procedural default doctrine. Schlup v. Delo, 513 U.S. 298 (1995). As the Court in Schlup explained, "if there were no question about the fairness of the criminal trial, a Herrera type claim would have to fail unless the federal habeas court is convinced that those new facts unquestionably establish [the petitioner's] innocence. On the other hand, if the habeas court were merely convinced that those new facts raise sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that the trial was untainted by constitutional error [the petitioner's] threshold showing of innocence would justify

38

a review of the merits of the constitutional claims." Id. at 317.

Where the claim of actual innocence is premised upon a trial with error, then a different and lesser standard of judicial review of "sufficient doubt" applies. In Schulp, the Court addressed the standard of proof that a federal petitioner would have to show to establish the actual innocence exception to the procedural default rule in non-capital cases. In contrast, for cases other than death penalty cases, the Court in Schulp applied the standard in its earlier Carrier decision stating:

> [W]e hold that the Carrier "probably resulted" standard rather than the more stringent Sawyer standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims.

> The Carrier standard requires the habeas petitioner to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." 477 U.S. at 496, 106 S.Ct. at 2649-2650. To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence. **The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under Sawyer. The Carrier standard thus ensures that petitioner's case is truly "extraordinary,"** McCleskey, 499 U.S. at 494, 111 S.Ct. at 1470, while still providing petitioner a meaningful avenue by which to avoid a manifest injustice.

> Carrier requires a petitioner to show that he is "actually innocent." As used in Carrier, actual innocence is closely related to the definition set forth by this Court in Sawyer. To satisfy the Carrier gateway standard, a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.

> Several observations about this standard are in order. The Carrier standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. Indeed, with respect to this aspect of the Carrier standard, we believe that Judge Friendly's description of the inquiry is appropriate: the habeas court must make its determination concerning the

petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

The consideration in federal habeas proceedings of a broader array of evidence does not modify the essential meaning of "innocence." The Carrier standard reflects the proposition, firmly established in our legal system, that the line between innocence and guilt is drawn with reference to a reasonable doubt. See In re Winship, 397 U.S. 358, 90 S.Ct. 1068. Indeed, even in Sawyer, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt. Thus, whether a court is assessing eligibility for the death penalty under Sawyer, or is deciding whether a petitioner has made the requisite showing of innocence under Carrier, the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence.

Id. at 326-28 (footnotes omitted) (emphasis added).

Petitioner's actual innocence claim is not based on newly discovered evidence. Thus, the Court concludes that Petitioner has not met the standard under the actual innocence doctrine to excuse his procedural defaults.

For these collective reasons, the Court concludes that the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed here within.

**ENTERED** this 2nd day of July, 2014

WILLIAM J. HAYNES, JR.
Chief United States District Judge